**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CHRYSTELL D. WOODS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:14-CV-1990-B-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact and recommendation.  Before the Court is *Plaintiff's Appeal from the Decision of the Commissioner of Social Security*, filed September 12, 2014 (doc. 14).  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for reconsideration.

## I.  BACKGROUND[2]

### A.    Procedural History

Chrystell D. Woods (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act.  (Doc. 1; R. at 3-8.)  On May 11, 2011, she applied for DIB, alleging disability beginning on January 8, 2011. (R. at 52-53, 114.)  Her claim was denied initially and upon reconsideration.  (R. at 52-53.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on December

---

[2]  The background information is summarized from the record of the administrative proceeding, which is designated as "R."

17, 2012.  (R. at 26-51.)  On February 21, 2013, the ALJ issued a decision finding her not disabled.  (R. at 10-25.)  She appealed, and the Appeals Council denied her request for review on February 25, 2014, making the ALJ's decision the final decision of the Commissioner.  (R. at 3-8.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (R. at 1-2; *see* doc. 1.)

### B.    Factual History

#### 1.    Age, Education, and Work Experience

Plaintiff was born on April 3, 1965, and was 47 years old at the time of the hearing.  (R. at 26, 114.)  She had completed one year of college and had past relevant work as a claims processor.  (R. at 32, 46, 141.)

#### 2.    Medical, Psychological, and Psychiatric Evidence

Marlon Padilla, M.D., at Backworx of Dallas, P.A., saw Plaintiff on September 20, 2010, for injuries sustained in a work-related accident in 2007.  (R. at 351-54.)  She complained of pain in her cervical spine, lumbar spine, right knee, and left shoulder.  (R. at 351.)  Plaintiff had severe neck pain and stiffness with spasms on flexion, extension, and rotation, as well as decreased range of motion.  (R. at 353.)  She also had spinal tenderness in the upper lower thoracic lumbar region; severe pain with decreased range of motion on flexion, extension, and rotation in her thoracic spine; and severe pain with decreased range of motion with flexion, extension, and rotation in her lumbar spine.  (*Id.*)  Plaintiff experienced increased pain with sitting, prolonged standing, and walking downstairs.  (*Id.*)  Straight leg testing was positive at 30°, and she had an unsteady and slow gait.  (*Id.*)  She also had bilateral shoulder and knee pain, stiffness, and weakness, with decreased range of motion.  (*Id.*)  Dr. Padilla's diagnostic assessments were sprain/strain of neck, sprain/strain of acromioclavicular, displaced lumbar intervertebral disc, sprain/strain of lateral collateral ligament

of knee, brachial neuritis/radiculitis, and unspecified internal derangement knee.  (R. at 354.)

On February 18, 2011, Plaintiff saw Dr. Padilla again.  (R. at 335-38.)  She complained of low back pain and right lower extremity radiculitis and reported weakness with weight bearing or walking.  (R. at 335.)  Dr. Padilla observed decreased range of motion in her neck, severe pain with spasms, and pain and stiffness on flexion and extension.  (R. at 337.)  She had spinal tenderness in the upper lower thoracic lumbar region, and her thoracic spine had decreased range of motion with flexion, extension, and rotation.  (*Id.*)  Plaintiff had decreased range of motion in her lumbar spine area with flexion, extension, and rotation and suffered bilateral shoulder and knee pain, stiffness, and weakness, and decreased range of motion.  (*Id.*)  Plaintiff experienced severe pain, and the pain increased when she sat, stood for a prolonged period of time, and walked downstairs.  (*Id.*)  A straight leg raising test was positive at 30°.  (*Id.*)  Plaintiff had unsteady and slow gait.  (*Id.*)  Dr. Padilla's diagnostic assessments were sprain/strain of neck, sprain/strain of acromioclavicular, displaced lumbar intervertebral disc, sprain/strain of lateral collateral ligament of knee, brachial neuritis/radiculitis, and unspecified internal derangement knee.  (R. at 338.)  He referred Plaintiff to Francisco Batlle, M.D., for a functional capacity evaluation and an X-ray of her spine.  (*Id.*)

On March 28, 2011, Plaintiff saw Dr. Batlle at Wellspine, P.A., for a consultation.  (R. at 381.)  She reported that she fell on a wet surface at work in 2007 and experienced low back pain that radiated into her right thigh and calf, and intermittently into her right ankle.  (*Id.*)  Her pain level was 7 out of 10 normally, but it worsened after prolonged sitting and standing, and when coughing, sneezing, or attempting a Valsalva maneuver.[3]  (*Id.*)  Plaintiff had an antalgic gait, and difficulty

---

[3]  A Valsalva maneuver is "a forceful attempt at expiration when the airway is closed at some point; *especially*: a conscious attempt made while holding the nostrils closed and keeping the mouth shut[.]"  Valsalva Maneuver definition, *Merriam-Webster.com*, *available at* http://www.merriam-webster.com (last visited April 8, 2015).

walking on her toes, less difficulty walking on her heels, and no difficulty walking in tandem.  (R. at 382.)  A sensory examination showed "a hypoesthetic region in the L5 and S1 distributions on the right to pin prick and light touch," but otherwise intact.  (*Id.*)  Dr. Battle's diagnostic impressions were lumbar radiculopathy, herniated nucleus pulposus at L5-S1, and lumbago.  (*Id.*)  She recommended a magnetic resonance imaging (MRI) of Plaintiff's lumbar spine.  (*Id.*)

On April 14, 2011, Plaintiff had an MRI of her lumbar spine at North Texas Imaging Hampton Center.  (R. at 383.)  Dee L. Martinez, M.D., noted (1) a large 12 millimeter right paracentral disc protrusion at L5-S1 that impinged on the thecal sac and the right S1 nerve root, and "the disk [sic] material filled the entirety of the right lateral recess[]"; (2) a four millimeter posterior central disc protrusion at L4-L5 that mildly impinged on the thecal sac and a mild narrowing of the both of the lateral recesses; (3) mild disc desiccation at L3-L4 and L5-S1; (4) minimal degenerative spondylosis from L3-L4 through L5-S1; and (5) moderate degenerative facet joint hypertrophy from L1-L2 through L5-S1.  (*Id.*)

On May 13, 2011, Plaintiff saw Dr. Batlle.  (R. at 385.)  She reported no significant improvement of her low back pain that radiated into her right lower extremity.  (*Id.*)  Her pain level was normally between 7-8 out of 10, but it worsened after prolonged sitting and standing, and when coughing, sneezing, or attempting a Valsalva maneuver.  (*Id.*)  Plaintiff weighed 270 pounds with a body mass index (BMI) of 42.2.  (*Id.*)  Her "[l]umbar range of motion was decreased in forward flexion, secondary to body habitus and pain."  (R. at 386.)  A motor exam showed that Plaintiff's gastrocnemius muscle strength on the right was 4/5, and all others were 5/5.  (*Id.*)  Her deep tendon reflexes were +1 in the right ankle jerk, +2 throughout, and symmetrical.  (*Id.*)  She had an antalgic gait and "marked difficulty with toe walking, less difficulty with heel walking and no difficulty with tandem walk[ing.]"  (*Id.*)  "Straight leg raising was positive on the right at 45°, negative on the left."

4

(*Id.*)  A sensory exam again showed "a hypoesthetic region in the L5 and S1 distributions on the right to pin prick and light touch[.]"  (*Id.*)  Dr. Batlle also reviewed Plaintiff's MRI from April 14, 2011, and noted the large herniated nucleus pulposus paracentrally and toward the right at L5-S1 with severe right-sided foraminal stenosis and right lateral recess stenosis.  (*Id.*)  She also observed effacement of the right S1 nerve root sheath.  (*Id.*)  Dr. Batlle's diagnostic impressions were lumbar radiculopathy, herniated nucleus pulposus at L5-S1, and lumbago.  (*Id.*)  She recommended a lumbar laminectomy, discectomy, foraminotomy, and partial facetectomy at L5-S1 because conservative medical therapy such as physical therapy and epidural steroid therapy had failed, Plaintiff had suffered pain greater than six months, and the MRI reading showed abnormalities.  (R. at 387.)

On June 8, 2011, Joyce Kay Hamilton, MLA/LPC conducted an in-depth medical health and behavior assessment to identify factors for "the prevention, treatment, or management of [Plaintiff's] physical injury."  (R. at 293.)  Plaintiff rated the average physical pain she suffered at 8 out of 10, the best case scenario at 7, and the worst at 10.  (R. at 295.)  She reported increased pain with walking, sitting for an extended period, standing, taking a shower, lying down, stretching, doing laundry, and driving.  (*Id.*)  After reviewing Plaintiff's medical records and interviewing her, Ms. Hamilton recommended a chronic pain management program and noted that her mental, behavioral, psychological and/or psycho-social management needs would be monitored.  (R. at 298.)

On August 5, 2011, Tamika L. Perry, D.O., P.A., a state agency medical consultant (SAMC), examined Plaintiff.  (R. at 196-97.)  Her chief complaints were back, leg, shoulder, and neck pain with neuropathy.  (R. at 196.)  She reported numbness and tingling in the left shoulder that radiated to her left hand and low back pain with recurrent muscle spasms.  (*Id.*)  Plaintiff described her back pain as "a sharp stabbing pain with associated numbness in the buttocks and left thigh[,]" and the pain and numbness radiated down her leg.  (*Id.*)  She reported difficulty in walking long distances,

5

increased pain when she sat for long periods of time, and heaviness and a burning sensation in her posterior neck. (*Id.*) Plaintiff's pain decreased when she rested and took her medications. (*Id.*) She weighed 297.2 pounds with a BMI of 58.5. (*Id.*) Her muscle strength was 3/5 in the left upper extremity, 4/5 in the right upper extremity, and 5/5 in the lower extremities. (R. at 197.) Dr. Perry did not observe any crepitus, warmth, or tenderness in Plaintiff's bilateral elbows, hips, and knees. (*Id.*) She noted "no appreciable atrophy in upper or lower extremities." (*Id.*) Plaintiff's left shoulder lacked the full range of motion; she was unable to abduct it greater than 90 degrees. (*Id.*) Her neck flexion and extension were limited due to discomfort. (*Id.*) "She [also did] not demonstrate the ability to hop and squat." (*Id.*) Plaintiff did not need an assistive device to ambulate. (*Id.*) Her cranial nerves were grossly intact, and her patellar and biceps deep tendon reflexes were 2/4 bilaterally. (*Id.*) When tested, Plaintiff's conventional, tandem, and heel/toe walking were within normal limits. (*Id.*) She "demonstrate[d] the ability to reach, handle, finger, and feel objects by picking up a pen and signing [her] name." (*Id.*) She had limited range of motion of the neck, left shoulder, and lumbar spine due to pain and discomfort. (*Id.*) Plaintiff's right knee X-ray showed mild degenerative changes, her left shoulder X-ray showed the remote surgical repair of the left distal clavicle, and her lumbar spine X-ray showed mild to moderate degenerative changes. (*Id.*)

On August 31, 2011, Plaintiff saw Eric R. Naifeh, R.N., F.N.P., a nurse practitioner at Superior Healthcare Center (Superior). (R. at 214.) Plaintiff reported that low back pain bothered her, especially when she sat for prolonged periods of time. (*Id.*) Mr. Naifeh observed low back and right knee stiffness and tenderness. (*Id.*) Plaintiff weighed 288 pounds with a BMI of 54.47. (*Id.*) Her neck was supple, non-enlarged, and non-tender. (R. at 216.) Plaintiff's back had tenderness in the lower lumbar region, and positive for straight leg raising bilaterally. (*Id.*) Her right knee was

tender and had decreased range of motion. (*Id.*) Mr. Naifeh's diagnostic assessments were displaced lumbar intervertebral disc, sciatica, and other internal derangement of the knee. (*Id.*) He recommended that Plaintiff continue with her home exercise program and use a wedge pillow to help take pressure off her low back when lying supine. (*Id.*)

On October 7, 2011, Plaintiff saw Mr. Naifeh for an evaluation of her low back pain. (R. at 211-13.) She complained of persistent low back pain and bilateral leg pain that was worse on the left side. (R. at 211.) Mr. Naifeh found spinal tenderness in her upper lower back and limited range of motion with pain. (R. at 212.) Plaintiff's toe and heel walking were diminished to 4/5 bilaterally, and a single squat and rise was diminished to 4/5 bilaterally. (*Id.*) Plaintiff's straight leg raising test showed low back and bilateral leg pain at a 20 degree angle. (R. at 213.) Mr. Naifeh's diagnostic assessments were lumbago, lumbosacral neuritis unspecified, and displaced lumbar intervertebral disc. (*Id.*) Plaintiff was advised to change her positions often and to engage in aerobic activities such as walking, swimming, stationary bicycle, or light jogging, to avoid debilitation. (*Id.*)

On December 9, 2011, Plaintiff saw James Galbraith, M.D., at Superior for her neck, low back, and shoulder pain. (R. at 241-45.) She had neck, low back, and left shoulder stiffness, left arm and bilateral leg pain, and depressed mood. (R. at 243.) She weighed 270 pounds with a BMI of 51.06. (R. at 244.) Plaintiff experienced pain and stiffness in her neck in flexion, on extension and rotation. (*Id.*) Her back had spinal tenderness in the "upper lower lumbar region with decreased" range of motion on all planes with pain. (*Id.*) A bilateral straight raise leg test was positive, indicating low back and leg pain. (*Id.*) Plaintiff's gait was slow and labored. (*Id.*) Her left shoulder was tender and had decreased range of motion around the glenohumeral joint, and her right knee was tender and had decreased range of motion. (*Id.*) Plaintiff's left upper extremity and bilateral lower extremities had motor strength of 4/5. (*Id.*) Her heel and toe walking were limited

7

to 4/5 bilaterally.  (*Id.*)  Her deep tendon reflexes were +1 in the patellar right and left, +1 in Achilles right and left, and all others were +2 and symmetric.  (*Id.*)  Plaintiff had a normal mood, except for being anxious and depressed.  (*Id.*)  Dr. Galbraith's diagnostic assessments were (1) displaced lumbar intervertebral disc; (2) lumbago; (3) unspecified neuralgia neuritis/radiculitis; (4) cervicalgia; (5) displaced cervical intervertebral disc; (6) contusion of knee; and (7) unspecified disorders of bursae and tendons in shoulder region.  (*Id.*)  He concluded that Plaintiff "truly need[ed] surgical repair of the 1 centimeter disc herniation" and recommended a consultation with a neurosurgeon.  (*Id.*)  He noted the previous evaluations that showed that Plaintiff was "below a Sedentary PDL and unable to perform her previous job due to [her inability] to sit for long periods of time, difficulty with [sic] reaching due to left upper extremity pain, increased neck pain when typing on computers and difficulty focussing[sic]/concentrating due to her perceived levels of depression."  (R. at 244-45.)  Dr. Galbraith advised Plaintiff to change her positions often and "recommended aerobic activity, such as walking, swimming, stationary bicycle, light jogging to avoid debilitation, as tolerated within first 2 weeks."  (R. at 245.)

On February 27, 2012, Dr. Batlle wrote a letter of causation.  (R. at 374-76.)  She observed that Plaintiff's "[l]umbar range of motion was decreased in forward flexion secondary to body habitus and pain."  (R. at 374.)  A motor exam showed that Plaintiff had 4/5 strength in the gastrocnemius muscle on the right, and 5/5 in all other areas.  (*Id.*)  "Deep tendon reflexes were +1 in the right ankle jerk, otherwise +2 throughout and symmetrical."  (*Id.*)  Plaintiff had an antalgic gait and marked difficulty walking on her toes, less difficulty walking on her heels, and no difficulty walking in tandem.  (R. at 374-75.)  "Straight leg raising was positive on the right at 45°, negative on the left."  (R. at 375.)  Dr. Batlle also observed "a hypoesthetic region in the L5 and S1 distributions on the right to pin prick and light touch[.]"  (*Id.*)  She reviewed Plaintiff's lumbar spine

MRI from April 14, 2011, and observed "a large herniated nucleus pulposus paracentrally and toward the right at L5-S1 approximately 12 mm with severe right sided foraminal stenosis and right lateral recess stenosis[, and] effacement of the right S1 nerve root sheath as well." (*Id.*) Her diagnostic impressions were (1) lumbar radiculopathy; (2) herniated nucleus pulposus at L5-S1; and (3) lumbago. (*Id.*) Dr. Batlle concluded that because the conservative therapy such as "physical therapy and epidural steroid therapy" had failed and Plaintiff had suffered pain for greater than six months, her "current neurologic status with evidence of a large disc herniation" made her a surgical candidate. (*Id.*)

On May 30, 2012, Charles E. Willis, II, M.D., at Elite Healthcare saw Plaintiff for an initial consultation. (R. at 264-65.) A physical examination showed that Plaintiff's cervical spine and thoracic spine areas had a good range of motion on all planes. (R. at 264.) Plaintiff's lumbar spine area, however, had decreased range of motion by 40%. (R. at 265.) Straight leg raising was positive at 90° on the right and 60° on the left. (*Id.*) Plaintiff had normal toe and heel walking. (*Id.*) She had "[d]ecreased sensation to left upper and left lower extremities to light touch and pin prick." (*Id.*) A motor test showed a "[d]ecreased motor deficits to the left lower extremity." (*Id.*) Dr. Willis's diagnostic assessments were lumbar radiculopathy, lumbar disc displacement, and cervical radiculopathy. (*Id.*)

On July 26, 2012, Voranart Kukai Sunakapakdee, M.D., at Green Diagnostic, Inc., conducted a Physical Performance Exam. (R. at 266-84.) A pinwheel examination revealed "a decrease in cutaneous (skin) sensation over the dermatomes (skin) associated with left leg radiation at L2-S2." (R. at 269.) Plaintiff had an abnormal gait. (*Id.*) Her physical demand level was at below sedentary. (R. at 266, 269.) She "demonstrated objective clinical signs and symptoms of a dysfunctional lumbar and cervical region." (R. at 266.) She had "difficulty with lumbar and

cervical range of motion when compared to accepted norms[]" and the range of motion "was also associated with pain[.]" (R. at 267.) Plaintiff had extreme difficulty with pain during the dynamic box lift test. (*Id.*) "She experienced weakness in the lumbar and cervical regions as demonstrated by the lower extremity dexterity, electronic isometrics, biomechanics, gait training, dynamic lift and treadmill testing." (*Id.*) Plaintiff had difficulty stooping, bending, kneeling, crouching, repetitive crouching, walking, climbing, standing, sitting, reaching, pushing and pulling. (*Id.*) She was asked to walk on a treadmill, but the treadmill test had to be suspended due to pain and abnormal ambulation. (R. at 284.)

On August 24, 2012, Albert E. Sanders, M.D., conducted a Designated Doctor Examination of Plaintiff "to determine maximum medical improvement and impairment rating." (R. at 260-63.) He observed that Plaintiff's August 9, 2007 MRI of her cervical spine showed disc protrusions from C3 to C7, an October 5, 2007 MRI of her lumbosacral spine showed a disc herniation at L5/S1, and an April 14, 2011 MRI showed a large herniated nucleus pulposus at L5/S1 impinging on the thecal sac with some protrusion of the L4/L5 disc. (R. at 260.) He further noted that Plaintiff's primary issue was "the low back pain radiating into her left leg[.]" (*Id.*) Surgery was recommended, but it was not approved. (*Id.*) On the day of the examination, Plaintiff weighed 275 pounds. (*Id.*) Her gait was good, and she stood on her heels and toes well. (R. at 261.) "On forward flexion, her fingertips [reached] 18 inches from the floor", but she felt pain on lateral flexion to the left. (*Id.*) All of Plaintiff's major muscle groups in her upper and lower extremities were graded a 5. (*Id.*) "Straight leg raising [was] possible bilaterally to 80° when sitting[,]" and when she was supine, straight leg raising caused pain on the right at approximately 30° and on the left at approximately 10°. (*Id.*) Dr. Sanders noted that Plaintiff had a 5% lumbar impairment under DRE Category II, and a total of 10% whole person impairment. (R. at 262.)

On August 31, 2012, John Pearson, D.C., conducted a complete evaluation and completed a Report of Medical Evaluation for the  Texas Department of Insurance Workers' Compensation division.  (R. at 247-48, 251-54.)  His diagnoses were cervical radiculitis, lumbar radiculitis, right knee contusion, and left shoulder contusion.  (R. at 251.)  An orthopedic lumbar evaluation was positive for tenderness to palpation at L5, decreased range of motion flexion at 50°, extension at 20°, right lateral flexion at 15° and left lateral flexion at 15°.  (R. at 252.)  Straight leg raising was positive on the left side at 70° and on the right side at 50°.  (*Id.*)  Straight leg raising while sitting was positive for both the left and the right.  (*Id.*)  Plaintiff's deep tendon reflex was 2/4 at both L4 left and  right, and 1/4 at both S1 left and right.  (*Id.*)  Dr. Pearson concluded that she was "at maximum medical improvement" and had "11% whole person impairment rating."  (R. at 248.)  Michael Holder, D.C., Plaintiff's treating doctor, agreed with the report and signed it on September 28, 2012.  (R. at 247.)

### 3.    Hearing Testimony

On December 17, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 26-51.)  Plaintiff was represented by an attorney.  (R. at 26-30.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she was married and lived with her husband and 22-year old son.  (R. at 31.)  She began working in the insurance industry doing data entry in 1984.  (R. at 34-35.)  Her past job required her to be seated most of the day.  (R. at 44.)  Plaintiff tried to alternate between a sitting position to a standing position in her past job, but she was still in pain and ended up dragging her legs.  (R. at 44-45.)  She had not worked since the onset date of January 2011.  (R. at 33.)

Plaintiff suffered the most pain in her lower back, but the pain in her legs had been getting worse due to a bulging disc in her back.  (R. at 32, 37.)  On an average day with medication,

Plaintiff's pain was at seven on a scale of ten, with ten representing the worst pain. (R. at 37.) Her pain increased when she sat for too long, or when she walked. (*Id.*) The length of time she could sit before she needed to change positions or get up varied. (*Id.*) She could not do a job that required her to sit most of the day. (R. at 39.) She could sit maybe an hour and stand for 20 minutes at most. (R. at 38-39.) Plaintiff could drive only short distances, and even then she was in pain because her right leg stiffened and her left leg had symptoms similar to a frostbite. Her husband drove her to the hearing. (R. at 31.) Plaintiff could use her hands, but her left hand went numb at random. (R. at 40.) She could, however, feel hot or cold temperatures with her hands, and write a one-page letter. (*Id.*) When Plaintiff lifted her hands over her head, the left side of her neck was in pain. (R. at 42-43.) Her attention, memory, and concentration had gotten worse. (R. at 40.) She had trouble sleeping and nodded off for about two hours at night; she napped a little during the day and got a total of five to six hours of sleep each day. (R. at 41.)

Plaintiff sometimes went to the grocery store despite her pain, if there was no one to help her. (R. at 39.) There, she either asked for others to help loading items into her cart or took her time to do it herself. (R. at 40.) She could not carry the grocery bags into her house by herself. (R. at 39-40.) She went to church whenever she could tolerate the pain, but frequently moved and suffered constant pain while there. (R. at 41-42.) She was a member of the church choir but had been on medical leave since January 2011. (R. at 45.) Sometimes, Plaintiff went to the movie theaters with recliners or big chairs where she could lie down, or lie on her husband's lap. (R. at 44.)

### b.     *VE's Testimony*

The VE classified Plaintiff's past relevant work as a claims processor. (R. at 46.) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work history could perform her past relevant work with the following limitations: no climbing, kneeling,

crouching, crawling; occasional stooping or balancing; frequent reaching, but only occasional overhead reaching with the left, non-dominant, arm; frequent bilateral handling and fingering; and avoiding work with unprotected heights and hazardous moving machinery.  (R. at 47.)  The VE testified that the hypothetical person could perform Plaintiff's past relevant work.  (*Id.*)

The ALJ then modified the hypothetical, allowing the hypothetical person to stand and stretch hourly for a few minutes at her workstation.  (R. at 48.)  The VE testified that the additional limitation was not an issue.  (*Id.*)  The ALJ modified the hypothetical again, adding that the hypothetical person needed to alternate sitting and standing at will.  (*Id.*)  The VE testified that if she needed to sit or stand at will at the rate of 10 to 15 minutes each, she would not be able to perform Plaintiff's past relevant work.  (*Id.*)  If the hypothetical individual sat or stood every half-hour, the limitation would not be a problem.  (*Id.*)  The VE also testified that the maximum of one-and-a-half days of absences per month was tolerated, but termination would generally follow if a person's absences exceeded that on a recurring basis.  (*Id.*)  When the ALJ asked whether any of such positions would permit the individual to recline to perform her job, the VE testified in the negative.  (R. at 48-49.)  When the ALJ asked the VE whether his testimony was consistent with the dictionary of occupational titles (DOT), he testified that it was "not inconsistent," clarifying that the overhead reach limitation and his comments related to sitting, standing, and reclining, as well as absenteeism, came from his experience.  (R. at 49.)

C.   **ALJ's Findings**

The ALJ issued her decision denying benefits on February 21, 2013. (R. at 10-21.)  At step one, she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 8, 2011.  (R. at 15.)   At step two, she found that Plaintiff had seven severe impairments: lumbar degenerative disc disease, lumbar disc herniation with radiculopathy, sciatica,

cervical radiculopathy, mild degenerative disc disease of the right knee, status post surgical repair of the left distal clavicle, and obesity.  (*Id.*)  Despite those impairments, at step three, the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled Listings 1.04 and 1.02.  (R. at 16-17.)

Before proceeding to step four, the ALJ determined that Plaintiff had following RFC: lift and carry a maximum of 10 pounds; stand and walk two hours in an eight-hour workday; sit six hours in an eight-hour workday with normal breaks with an option to stand/stretch hourly at the workstation as defined in 20 C.F.R. § 404.1567(a); never climb, kneel, crouch, or crawl; occasionally balance and stoop; frequently reach, handle, and finger, but only occasional overhead-reach with the upper left extremity; and avoid work exposure to unprotected heights and hazardous moving machinery.  (R. at 17.)  At step four, relying on the VE's testimony, the ALJ determined that Plaintiff could perform her past relevant work.  (R. at 21.)  Accordingly, the ALJ concluded that Plaintiff was not disabled as the term is defined under the Social Security Act, at any time between her alleged onset date and the date of the ALJ's decision.  (*Id.*)

## II. ANALYSIS

A.   <u>Legal Standards</u>

1.   **Standard of Review**

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence.  *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**      **Issues for Review**

Plaintiff presents three issues for review:

(1) Did the Commissioner properly evaluate medical opinion evidence in determining Plaintiff's residual functional capacity?

(2) Did the Commissioner properly evaluate the evidence to determine whether the Plaintiff has an impairment which satisfies the requirements for presumptive disability?

(3) Did the Commissioner properly consider all of the Plaintiff's impairments in determining her residual functional capacity (RFC)?

## C.    **Step Three Listing Analysis**[4]

Plaintiff argues that remand is required because the ALJ erred at step three of the sequential five-step analysis by determining that her impairments did not meet a listing. (Doc. 14 at 5-9.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[5] *Compton v. Astrue*, No. 3:09-CV-051513-13H, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d). The claimant has the burden of proving that her impairment or a combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that her unlisted impairment or

---

[4]  Because the step three analysis occurs before the RFC assessment, this issue is addressed first.

[5]  These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

a combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to all the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529-31; *see also* 20 C.F.R. § 404.1526(b)(2). The ALJ must consider all of the evidence that is relevant to the claimant's impairments and their effects on the claimant, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 416.926(c). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." *Id.* § 416.926(e).

1.       **Listing 1.04A**

Plaintiff contends that the ALJ erred when she determined that Plaintiff's impairments did not meet or equal Listing 1.04, citing *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007). (Doc. 14 at 5-7.) The Commissioner argues that *Audler* is distinguishable because the ALJ "did not summarily conclude that [Plaintiff] did not meet a listing." (Doc. 15 at 6.)

In *Audler*, the Fifth Circuit held that the ALJ committed legal error when she "summarily concluded" that the claimant's impairments were not severe enough to meet or medically equal one of the listed impairments, but "did not identify the listed impairment for which [the claimant's] symptoms fail[ed] to qualify," and did not "provide any explanation as to how she reached the conclusion[.]" *Audler*, 501 F.3d at 448. Noting that an ALJ was not "always required to do an exhaustive point-by-point discussion," the *Audler* court stated that it simply could not "tell whether her decision [was] based on substantial evidence" because she "offered nothing to support her conclusion at this step". *Id.* (internal quotation marks omitted) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

Applying *Audler*, courts have found that even when an ALJ specifically identifies a listing at step three, he/she errs by failing to discuss the medical evidence and provide the reasons for the step three determination because such failure prevented meaningful judicial review. *See Jones v.*

*Colvin*, No. H-13-1221, 2014 WL 3827819, at *9 (S.D. Tex. July 31, 2014) (concluding that the ALJ erred by failing to discuss evidence or provide reasoning for the step three determination); *Matthews v. Astrue*, No. 11-667-RLB, 2013 WL 5442265, at *4-5 (M.D. La. Sept. 27, 2013) (finding error where the ALJ specifically stated that she considered Listing 1.04A, but did not explain the basis for concluding that the claimant's sensory loss was due to an unrelated problem, and failed to discuss or mention any evidence relating to the remaining 1.04A criteria); *Inge ex rel. D.J.I. v. Astrue*, No. 7:09-CV-95-O, 2010 WL 2473835, at *9 (N.D. Tex. May 13, 2010) (finding that the ALJ erred by not specifically identifying the evidence he relied on for his conclusion at step three), *rec. adopted*, 2010 WL 2473598 (N.D. Tex. June 16, 2010).  "Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible."  *Inge ex rel. D.J.I.*, 2010 WL 2473835, at *9 (citing *Audler*, 501 F.3d at 448).

In this case, the ALJ identified seven impairments as severe at step two:  lumbar degenerative disc disease, lumbar disc herniation with radiculopathy, sciatica, cervical radiculpathy, mild degenerative disc disease of the right knee, status post surgical repair of the left distal clavicle, and obesity.  (R. at 15.)  At step three, she found that Plaintiff did

> not meet or medically equal Listing 1.04 because there [was] no evidence of compromise of the nerve root of the spinal cord with:
>
> A.     Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.     Spinal arachnoiditis, confirmed by an operative note or pathology report of

tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

(R. at 16.)[6] The ALJ did not discuss any evidence pertaining to Plaintiff's impairments at step three. (*See id.*)

Although the ALJ quoted the requirements of Listing 1.04 at step three, she did not identify any medical evidence or explain her conclusion that Plaintiff did not meet or medically equal Listing 1.04. Although it was her responsibility to determine whether Plaintiff met a listing at step three, she was required to cite to evidence and provide reasons in order to permit meaningful judicial review. *See Audler*, 501 F.3d at 448; *Cadzow v. Colvin*, No. 5:12-CV-225-C, 2013 WL 5585936, at *4 (N.D. Tex. Oct. 10, 2013) (stating that it was the ALJ's responsibility to determine whether the claimant's impairments were severe enough to meet or medically equal the criteria of a listing, but in the absence of a meaningful discussion, courts cannot determine whether the ALJ's step three determination was supported by substantial evidence). The ALJ committed legal error when she failed to discuss any of the Plaintiff's medical evidence and explain how the evidence did not meet the severity criteria of Listing 1.04. *See Grays v. Colvin*, No. 3:12-CV-00138-B(BH), 2013 WL 1148584, at *11 (N.D. Tex. Mar. 19, 2013) ("The ALJ committed legal error at step three by failing to discuss any of Plaintiff's medical evidence, including the findings and opinions of his treating physicians, as the evidence related to the issue of whether Plaintiff's degenerative disc disease met the severity criteria of Listing 1.04A.").

---

[6]   The ALJ did not specifically refer § 1.04C in the last paragraph, but it matches the listing word for word. (*Compare* R. at 16 *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §1.04(C).)

### 2.      Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and to avoid waste of time." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)) (per curiam).  "[P]rocedural improprieties . . . will therefore constitute a basis for remand *only if* such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (emphasis added); *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  The ALJ's error is harmless if the substantial rights of a party have not been affected.  *See Alexander*, 412 F. App's at 722; *see also Audler*, 501 F.3d at 448 (applying harmless error analysis to the ALJ's failure to state any reason for her adverse determination at step three).

"In considering whether a step three error was harmless in *Audler*, the Fifth Circuit reviewed the evidence to determine whether the claimant had demonstrated that she satisfied all the criteria of the Listing at issue." *Pannell v. Astrue*, No. 3:11-CV-2385-D, 2012 WL 4341813, at *3 (N.D. Tex. Sept. 21, 2012) (citing *Audler*, 412 F.3d at 448-49).  Here, Plaintiff contends that she meets the Listing 1.04A criteria.  (Doc. 14 at 5.)  The first requirement is evidence that a claimant had disorders of the spine that resulted in the compromise of a nerve root or the spinal cord.  20 C.F.R. Pt. 404, Subpt. P., App. 1 § 1.04.  "To meet the criteria of Listing 1.04A, the record must contain sufficient evidence of (a) nerve root compression characterized by neuro-anatomic distribution of pain, (b) limitation of motion of the spine, (c) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and (d) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Wyre v. Comm'r, Soc. Security*

*Admin.*, No. CIV.A 13-201-JWD-RLB, 2015 WL 589738, at *4 (M.D .La. Feb. 11, 2015) (internal quotation marks omitted) (quoting 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 1.04A); *see also Warren v. Colvin*, No. 3:14-CV-1038-BN, 2014 WL 7059489, at *4 (N.D. Tex. Dec. 15, 2014).  Aside from the diagnostic requirement and the Listing 1.04A criteria, Plaintiff also must demonstrate the required loss of function for a musculoskeletal impairment, which requires her to demonstrate "either an inability to ambulate effectively on a sustained basis . . . , or the inability to perform fine and gross movements effectively on a sustained basis." *Audler*, 501 F.3d at 449 (quoting 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(B)(2)).  Lastly, she must demonstrate that she met the Listing 1.04A's "criteria over a period that last[ed] or [was] expected to last at least 12 months." *Wyre*, 2015 WL 589738, at *6.

The first diagnostic requirement is met because the ALJ concluded at step two that Plaintiff had the severe spinal impairments of lumbar degenerative disc disease, lumbar disc herniation with radiculopathy, sciatica, and cervical radiculopathy.[7]  (R. at 15.)  Plaintiff was also diagnosed with lumbar radiculopathy, herniated nucleus pulposus at L5-S1, and lumbago.  (R. at 375, 381, 386).  Her April 14, 2011 lumbar spine MRI showed a 12 mm disc protrusion at L5-S1, impinging on the thecal sac and the right S1 nerve root, and "the disk [sic] material filled the entirety of the right lateral recess."  (R. at 383.)  That same MRI also showed spinal stenosis and a nerve root compression.  (R. at 375, 383, 385.)  Other medical evidence consistently showed that Plaintiff had neuroanatomic distribution of pain.[8]  (*See* R. at 196 (describing Plaintiff's back pain as a sharp

---

[7]  According to Listing 1.04, some examples of spinal disorders are: "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture[.]"  20 C.F.R. pt. 404, Subpt. P., App. 1 § 1.04.

[8]  A neuroanatomic distribution of pain "entails pain radiating to the extremities[.]"  *Jordan v. Astrue*, No. 10-1899, 2012 WL 443791, at *7 (W.D. La. Jan. 13, 2012).

stabbing that radiated down her leg), at 260 (noting that Plaintiff's primary issue was "the low back pain radiating into her left leg"), at 381 & 385 (stating that Plaintiff experienced low back pain that radiated into her right thigh and calf).)  Moreover, the ALJ concluded that one of Plaintiff's severe impairments was sciatica.[9]  (R. at 15.)  Plaintiff's MRI, other medical records, and the ALJ's findings show that she had nerve root compression with the neuroanatomic distribution of pain.

The limitation of motion of the spine can be supported by evidence of decreased range of motion of the lumbar spine.  *See Warren*, 2014 WL 7059489, at *5.  Here, medical records from May 13, 2011, and February 27, 2012, show that Plaintiff's "[l]umbar range of motion was decreased in forward flexion secondary to body habitus and pain."  (R. at 374, 386.)  Two other examining physicians observed spinal tenderness and decreased range of motion in the lumbar area.  (R. at 243, 265.)  This was consistent with reports from an SAMC and a nurse practitioner that Plaintiff's range of motion of lumbar spine was limited due to pain and discomfort. (R. at 197, 212.)  The medical records support a finding that Plaintiff had a limitation of motion of the spine.

The evidence of motor loss can be shown by muscle weakness or atrophy, and sensory loss includes numbness and paresthiesia.  *See Warren*, 2014 WL 7059489, at *4.  Sensory examinations on May 13, 2011, and February 27, 2012, showed that Plaintiff had "a hypoesthetic region in the L5 and S1 distributions on the right to pin prick and light touch[.]"  (R. at 375, 381, 386.)  Another examining physician observed decreased sensation in the left lower extremities.  (R. at 265.)  Multiple motor exams showed that Plaintiff's left upper extremity and bilateral lower extremities had decreased motor strength. (R. at 244, 386.)  An SAMC noted Plaintiff's report of numbness and

---

[9]  Sciatica "refers to pain that radiates along the path of the sciatic nerve–which branches from your lower back through your hips and buttocks and down each leg."  *Sciatica*, Mayo Clinic (April 3, 2015, 4:21 PM), www.mayoclinic.org/diseases-conditions/sciatica/basics/definition/con-20026478.

tingling in the left shoulder that radiated to her left hand, as well as numbness that began in her low back that radiated down her leg.  (R. at 196.)  The same SAMC observed that Plaintiff's muscle strength was weakened to 3/5 in the left upper extremity, and 4/5 in the right upper extremity.  (R. at 197.)  Other medical evidence also showed a reflex loss.  (*See* R. at 197, 252.)  The medical evidence therefore supports a finding of motor loss.  Plaintiff was also positive for straight-leg raising tests.  (R. at 212, 216, 244, 252, 261, 337, 386.)

According to Social Security Regulations, Plaintiff "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" to ambulate effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).  Here, the majority of the medical records note that Plaintiff had an abnormal gait.  (R. at 244 (observing slow and labored gait), at 269 (noting abnormal gait), at 284 (noting that Plaintiff had to stop the treadmill test due to pain and abnormal ambulation), at 337 (noting unsteady, slow gait), at 374 (noting antalgic gait), at 381 (same), at 386 (same).)  Plaintiff repeatedly reported that her pain increased when she walked.  (R. at 37, 196, 295.)  She had to terminate a treadmill test due to severe pain and abnormal ambulation.  (R. at 284.)  The record supports a finding that she was unable to ambulate effectively. *See e.g., Hermosillo v. Astrue*, No. 1:10-CV-00198-BG, 2011 WL 4528206, at *4 (N.D. Tex. Sept. 12, 2011) (observing that the majority of the medical records indicated that the claimant had antalgic gait), *rec. adopted*, 2011 WL 4528374 (N.D. Tex. Sept. 30, 2011).  Lastly, Plaintiff's medical records show that her condition had worsened over the years, and the spinal impairments had persisted over a period of 12 months.  (*See* R. at 247-354 (showing the consistent medical records of her spinal condition from September 2010 through August 2012).)

The medical evidence seems to satisfy all of the criteria for Listing 1.04A at step three.  *See Hermosillo*, 2011 WL 4528206 at *5 (listing record evidence supporting claimant's argument that

he met the criteria of Listing 1.04A, the court noted that "[n]o medical evidence contradicted these findings, and absent an explanation from the ALJ, it appears that [the claimant] met his burden of showing that he meets the requirements of § 1.04(A)").

The Commissioner argues that the ALJ gave little weight to Dr. Batlle's letter of causation because it relied heavily on Plaintiff's subjective reports.  (Doc. 15 at 5.)  The relevant portions of Dr. Batlle's letter of causation are from her direct examination of Plaintiff, however.  (*See* R. at 374-75, 381, 385.)  Even if the letter of causation is excluded from the evidence, other medical evidence supports a finding that Plaintiff's impairments met Listing 1.04, as discussed *supra*.  The Commissioner does not provide any contradicting evidence or explain Plaintiff's other consistent medical opinions.  *See Audler*, 501 F.3d at 449 (observing that the claimant's medical evidence appeared to have met the Listing 1.04A criteria and no medical evidence was introduced to contradict the claimant's evidence, the court concluded that the claimant's substantial rights have been affected).

The Commissioner contends that the ALJ did not err because she acknowledged that the April 14, 2011 MRI revealed a large herniated nucleus pulposus with severe right-sided foraminal stenosis and evidence of effacement of the right S1 nerve root sheath, and incorporated such condition in the restrictive RFC finding.  (Doc. 15 at 5.)  The ALJ did mention Plaintiff's MRI while making the RFC determination, but she did not explain how this condition did not meet or equal the Listing 1.04 criteria.  (*See* R. at 19.)  Even if the ALJ incorporated Plaintiff's herniated disc condition into the restrictive RFC finding, it does not satisfy her duty to explain at step three.  *See Matthews*, 2013 WL 5442265, at *5 (declining to accept the Commissioner's argument that the ALJ's existing decision was supported by substantial evidence because the ALJ failed to provide a reasoning at step three, and the evidence indicated that Plaintiff may have met or medically

equaled the Listing); *see also Boxie v. Comm'r, Soc. Security*, No. 12-CV-3170, 2015 WL 965704, at *9 (W.D. La. Mar. 2, 2015) (observing that the ALJ made a careful review of the record in other sections of the decision, but he failed to make similar review at step three, and the court lacked authority to reweigh the evidence).

The Commissioner further notes that Plaintiff could not be presumptively disabled at step three because nurse practitioner Naifeh and Dr. Galbraith recommended that she engage in aerobic activities, and she attended church and went to movie theaters.  (Doc. 15 at 5.)  "[T]he fact that her physician recommended that she begin an aerobic exercise regiment[, however,] does not contradict her allegation of disabling pain; there is nothing inconsistent about a person who is in too much pain to work a full-time job engaging in exercise[.]"  *Matthews-Sheets v. Astrue*, No. 1:08-CV-1426-WTL-DML, 2010 WL 987730, at *8 (S.D. Ind. Mar. 11, 2010) (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) ("Since exercise is one of the treatments that doctors have prescribed for [the claimant's] pain, and she does not claim to be paralyzed, we cannot see how her being able to talk two miles is inconsistent with her suffering severe pain.")).  Moreover, courts have concluded that a claimant's ability to carry on some daily activities is not substantial evidence that she was not disabled.  *See Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2006) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability.  One does not need to be utterly incapacitated in order to be disabled."); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (finding error when the ALJ merely listed the claimant's daily activities as substantial evidence that she did not suffer disabling pain because they did not establish that a person was able to engage in substantial physical activity); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("[T]he ALJ may not rely on minimal daily activities as substantial evidence

26

that a claimant [did] not suffer disabling pain."). A recommendation for aerobic exercise and attendance at church and movie theaters[10] do not overcome the medical evidence at step three.

In conclusion, Plaintiff's medical evidence shows that her spinal impairments may meet the Listing 1.04A criteria. The ALJ's failure to cite to medical evidence and give reasons for her decision at step three affected Plaintiff's substantial rights. *Audler*, 501 F.3d at 449 ("Absent some explanation from the ALJ to the contrary, [the claimant] would appear to have met her burden of demonstrating that she meets the Listing requirements for § 1.04A, and therefore her substantial rights were affected by the ALJ's failure to set out the basis for her decision at step three."); *see also Hermosillo*, 2011 WL 4528206, at *5 (finding that the ALJ's failure to explain at step three affected the claimant's substantial rights). The error is not harmless, and remand is warranted.[11]

### III.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for reconsideration.

**SO RECOMMENDED** on this 26th day of August, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[10]  Plaintiff testified that she went to church whenever her pain was tolerable, and even when she went, she moved constantly and still suffered pain. When she went to see a movie, she only went to movie theaters with recliners so she could recline, or with big chairs so that she could lie on her husband's lap. (R. at 41-42, 44.)

[11]  Because the ALJ committed legal error at step three, and that error may affect the determination of the remaining issues concerning the use of a medical expert at step three and the ALJ's consideration of evidence and impairments in her RFC assessment, they are not addressed.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE